CASE NO. 13-17596

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

JAYCEE DUGARD AND A. DUGARD

*Plaintiffs and Appellants,*

v.

THE UNITED STATES OF AMERICA

*Defendant and Appellee.*

---

On Appeal From The United States District Court for
The Northern District of California
Case No. 3:11 CV-04718 CTB
Hon. Carlos T. Bea, Circuit Judge, Sitting by Designation

---

## APPELLANTS' OPENING BRIEF

---

KINSELLA WEITZMAN ISER
KUMP & ALDISERT, LLP
Dale F. Kinsella (SBN 063370)
Jonathan P. Steinsapir  (SBN 226281)
Amber Holley Melius (SBN 227853)
David W. Swift (SBN 235033)
808 Wilshire Boulevard, Third Floor
Santa Monica, California 90401
Telephone: 310.566.9800 │ Facsimile: 310.566.9850

*Attorneys for Plaintiffs and Appellants*

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................. 1

JURISDICTIONAL STATEMENT ............................................. 4

STATEMENT OF THE ISSUES .............................................. 6

STATEMENT OF THE CASE ................................................. 7

I.   BACKGROUND FACTS ................................................ 7

     A.   The Federal Parole System Generally. ..................... 7

     B.   Phillip Garrido Is Sentenced to 50 Years in Prison
          Following A History of Drug Use Leading to Violent
          Sexual Assaults. ........................................... 8

     C.   Garrido is Paroled After Serving Just Over Ten Years. ...... 10

     D.   Parole Officers Are Well Aware of Garrido's Drug Use
          Leading to Sexually Violent Propensities. .................. 12

     E.   Parole Officers Were Required to Report Drug Related
          Violations by Garrido But Failed to Do So. ................. 13

     F.   While on Parole, Garrido Kidnaps Jaycee. .................. 17

II.  PROCEDURAL HISTORY OF THE CASE ................................. 19

     A.   Jaycee Files a Complaint in Federal Court. ................. 19

     B.   The District Court Denies the Government's Motion to
          Dismiss and Rejects the Argument that a Private
          Person Would Not Be Liable In Like Circumstances. .......... 20

     C.   Discovery Proceeds and G. Dugard, One of Jaycee's
          Daughters, Is Voluntarily Dismissed From the Case. ......... 24

D.    The Court Largely Denies the Government's Motion for Summary Judgment But Dismisses for Lack of Jurisdiction Because It Now Finds that a Private Individual Would Not Be Liable Here. ................................. 27

ARGUMENT ........................................................................... 37

I.    Under California Law, "A Private Individual Under Like Circumstances" Could be Liable For the Conduct Here. .............. 37

      A.    The "Private Person Analogue" Under the FTCA. .............. 37

      B.    Duty Under California Negligence Law Generally. ............. 39

      C.    California Does Not Limit Duty to "Specifically Identifiable Victims" in the "Private Person" Context. ........ 41

            1.    In California, Private Persons in a Special Relationship to a Third Party Have a Duty to Those Foreseeably Harmed by the Third Party. ......... 42

                  (a)    The Analogous California Cases. .................... 42

                  (b)    Application of These Cases Here. ................... 49

            2.    The Cases the District Court Relied Upon Are Inapposite. .................................................... 54

            3.    A Private Individual Would be Liable Under Like Circumstances. ............................................ 62

II.   The District Court Erred by Only Partially Denying Summary Judgment on Proximate Causation. ............................ 63

      A.    Jaycee Was Not Required to Show that Garrido Would Have Been In Jail on June 10, 1991. .................................... 63

            1.    There is Sufficient Evidence that Garrido Could Have Received a Revocation Sentence in Excess of the Guidelines. .......................................... 67

ii

　　　2.　　There is Sufficient Evidence That Garrido Would
　　　　　　Use Drugs While Serving A Revocation Sentence
　　　　　　*or* While on Reparole. ....................................................69

　　　3.　　There is Sufficient Evidence to Conclude that a
　　　　　　"Clean" Garrido Would Not Have Kidnapped
　　　　　　Jaycee. ......................................................................70

CONCLUSION ........................................................................72

CERTIFICATE OF COMPLIANCE ........................................73

STATEMENT OF RELATED CASES .....................................74

ADDENDUM 1　PAROLE VIOLATIONS OF PHILLIP GARRIDO
　　　　PRIOR TO THE KIDNAPPING OF JAYCEE DUGARD.............75

ADDENDUM 2　PERTINENT STATUTES ............................77

iii

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Barber v. Thomas*
432 U.S. 474 (2010) ...................................................................... 7

*Henderson v. United States*
846 F.2d 1233 (9th Cir. 1988) .................................................... 40

*In re Glacier Bay*
71 F.3d 1447 (9th Cir. 1995) ...................................................... 23

*Indian Towing Co. v. United States*
350 U.S. 61 (1955) ..................................................... 37, 38, 39, 54

*Lonberg v. Sanborn Theatres, Inc.*
259 F.3d 1029, as amended, 271 F.3d 953 (9th Cir. 2001) .............. 5

*Marsh v. Taylor*
925 F.2d 1131 (9th Cir. 1991) ...................................................... 7

*Matter of McLinn*
739 F.2d 1395 (9th Cir. 1984) .......................................... 34, 60, 61

*Mistretta v. United States*
488 U.S. 361 (1989) ...................................................................... 8

*Payton v. United States*
679 F.2d 475 (5th Cir. 1982) ...................................................... 23

*Rayonier Inc. v. United States*
352 U.S. 315 (1957) .............................................................. 37, 56

*Salve Regina Coll. v. Russell*
499 U.S. 225 (1991) .................................................................... 60

*United States v. Johnson*
256 F.3d 895 (9th Cir. 2001) ...................................................... 48

*United States v. Muniz*
374 U.S. 150 (1963) .......................................................... 33, 38, 54

*United States v. Olson*
546 U.S. 43 (2005) ........................................................... 33, 37, 55

*United States v. Symington*
195 F.3d 1080 (9th Cir. 1999) .................................................... 61

*Vickers v. United States*
    228 F.3d 944 (9th Cir. 2000) ...............................................23, 65, 66

*Vu v. Singer Co.*
    706 F.2d 1027 (9th Cir. 1983) .....................................34, 59, 60, 61

*White v. Roper*
    901 F.2d 1501 (9th Cir. 1990) .........................................................36

*Will v. United States*
    60 F.3d 656 (9th Cir. 1995) .............................................................36

*Xue Lu v. Powell*
    621 F.3d 944 (9th Cir. 2010) ..........................................................56

## STATE CASES

*Beauchene v. Synanon Foundation, Inc.*
    88 Cal. App. 3d 342 (1979) ...................................................57, 58, 61

*Bragg v. Valdez*
    111 Cal. App. 4th 421 (2003) ...................................................passim

*Brenneman v. State of California*
    208 Cal. App. 3d 812 (1989) ...........................................................54

*Cabral v. Ralphs Grocery Co.*
    51 Cal. 4th 764 (2011) ...............................................................39, 40

*Campbell v. General Motors Corp.*
    32 Cal.3d 112 (1982)..........................................................................70

*Cardenas v. Eggleston Youth Center*
    193 Cal. App. 3d 331 (1987) .....................................................57, 58

*Davidson v. City of Westminster*
    32 Cal. 3d 197 (1982)..................................................................54, 56

*McCallum v. Reilley*
    2007 WL 2455662, *1 (N.D. W.Va. 2007).).............................68, 69

*McDowell v. County of Alameda*
    88 Cal. App. 3d 321 (1979) .............................................................54

*Megeff v. Doland*
    123 Cal. App. 3d 251 (1981) .................................................47, 48, 54

*Myers v. Quesenberry*
    144 Cal. App. 3d 888 (1983) ................................................31, 47, 59

*People v. Heitzman*
    9 Cal. 4th 189 (1994) .......................................................................24

*Poncher v. Brackett*
    246 Cal. App. 2d 769 (1966) ...................................................42, 43

*Raven H. v. Gamette*
    157 Cal. App. 4th 1017 (1989) .......................................................65

*Reisner v. Regents of the Univ. of California*
    31 Cal. App. 4th 1195 (1995) ..................................................passim

*Rice v. Ctr. Point, Inc.*
    154 Cal. App. 4th 949 (2007) ...........................................56, 58, 59

*Rowland v. Christian*
    69 Cal. 2d 108 (1968).........................................39, 40, 45, 49

*Smith v. Freund*
    192 Cal. App. 4th 466 (2011) .....................................................48, 49

*Tarasoff v. Regents of Univ. of California*
    17 Cal. 3d 425 (1976).........................................40, 41, 46, 47

*Thompson v. County of Alameda*
    27 Cal. 3d 741 (1980).................................................................54

*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*
    1 Cal. 3d 586 (1970)...................................................................39

*Wise v. Superior Court*
    222 Cal. App. 3d 1008 (1990) ................................................24, 49

## FEDERAL STATUTES

18 U.S.C. § 3624(b) ...........................................................................7

28 U.S.C. § 1291.................................................................................4

28 U.S.C. § 1331.................................................................................4

28 U.S.C. § 1346(b) ..........................................................................23

28 U.S.C. § 1346(b)(1)..............................................................4, 20, 39

28 U.S.C. § 2254(d)(1).....................................................................61

28 U.S.C. § 2674..........................................................................passim

28 U.S.C. §§ 2672-2680....................................................................4

28 U.S.C.§ 2671.................................................................................4

Fed. R. App. P. 4(a)(1)(B)(i) .............................................................5

**STATE STATUTES**

Cal. Gov. Code § 845.8...............................................................57

Cal. Wel. & Inst. Code § 5150 ..............................................43

California Civil Code § 1714 .........................................39, 40

**TREATISES**

Fulwood, Isaac, *History of the Federal Parole System* (2003) .................7

Restatement (Second) of Torts §§ 315-20) ......................................passim

## INTRODUCTION

This is an action under the Federal Tort Claims Act ("FTCA"). The case itself involves a truly horrifying set of facts. This appeal, however, primarily involves a discrete issue of California negligence law.

On the morning of June 10, 1991, Appellant Jaycee Dugard, then 11-years-old, left her South Lake Tahoe home for school. She was not heard from again for 18 years. Her family, her friends, the authorities, and just about everyone else in the world did not know what had happened to her. Jaycee was found on August 26, 2009, with two daughters who were older than she was when she disappeared.

Jaycee had been abducted on her way to school that morning in 1991 by Phillip Garrido, a federal parolee, who took Jaycee to his home over one-hundred miles away. For several years following her kidnapping, she was repeatedly drugged and raped for hours on end by Garrido on methamphetamine-fueled "runs." She spent much of her time chained up in a shed in a concealed portion of Garrido's backyard. Eventually, she gave birth in that shed to two children.

In 1977, following *numerous* run-ins with the law involving rape and drugs, Garrido was convicted in federal court of kidnapping a

woman in South Lake Tahoe, driving her across state lines to a shed in Nevada, and raping her for hours. He was caught when a police officer fortuitously investigated the shed. Garrido blamed drugs for his violent behavior. At his 1977 trial, Garrido explained that, while high on drugs, he had deviant and violent sexual compulsions which he could not control. For example, he used to sit outside of schools and masturbate while watching girls between the ages of seven and ten. After his conviction, Garrido was sentenced to 50 years in federal prison. He was paroled after serving ten.

Because his previous drug use led him to engage in criminal conduct, Garrido was required to submit to regular drug testing as a special condition of parole. Parole officers recognized that "the potential for causing great physical harm is present if [Garrido] becomes unstable as a result of drug use." Garrido was described by medical professionals at the time of his parole as "a time bomb" and "like a pot boiling with no outlet valve." Yet in the two-and-a-half years between Garrido's initial parole and Jaycee's kidnapping, officers *ignored* roughly 70 documented drug-related parole violations (including *admissions* to going on weeks-long speed binges), despite being under mandatory duty to report

2

violations to the Parole Commission (who likely would have revoked his parole or otherwise controlled his drug use).

Not surprisingly, on summary judgment, the district court expressly held that there was sufficient evidence for a rational trier of fact to conclude that federal parole officers violated their mandatory duties and that the violation of those duties proximately caused harm to Jaycee and her daughters. Nevertheless, the district court dismissed the case because it found that, under California law, a "private individual under like circumstances," 28 U.S.C. § 2674, would have no duty to Jaycee or her daughters because they were not "specifically identifiable" to the Government.

The district court's interpretation of California law was erroneous, and we respectfully request that its judgment be reversed. [1]

---

[1] We refer to Appellant Jaycee Dugard as "Jaycee" and to her two daughters as "A. Dugard" (an Appellant), and "G. Dugard" (formerly a Plaintiff). (Both were minors when the case was filed, and their full names are not of record.) We use Jaycee's first name solely to distinguish between her and her daughters (and mean no disrespect by being unduly informal). We refer to Appellee as the United States or as the Government.

3

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction pursuant to 28 U.S.C.

§ 1346(b)(1): this is a civil action against the United States for money

damages under the FTCA. *See also* 28 U.S.C. § 1331, §§ 2671-2680. The

FTCA waives federal sovereign immunity, but contains certain

exceptions. The Government contended below that certain exceptions

apply and that the court therefore lacked jurisdiction (sovereign

immunity is jurisdictional). The primary exception at issue—the

requirement that a "private individual" would be liable in "like

circumstances"—is the primary issue on appeal.

This Court has jurisdiction pursuant to 28 U.S.C. § 1291: this is

an appeal from a final judgment of a district court dismissing the entire

action. (1ER 0001, 0053.) [2]

The district court entered judgment on October 28, 2013.

(1ER 0001.) The notice of appeal was filed on December 12, 2013,

(2ER 0080), "within 60 days of the entry of the judgment" in this action

where "one of the parties is … the United States." Fed. R. App. P.

---

[2] Citations to the Excerpts of Record are by volume number (in front of "ER") and page number (page numbers are continuous throughout volumes, e.g., Volume 1 ends at 1ER 0079 and Volume 2 picks up at 2ER 0080, etc.).

4(a)(1)(B)(i). *See also Lonberg v. Sanborn Theatres, Inc.*, 259 F.3d 1029, 1031, as amended, 271 F.3d 953 (9th Cir. 2001) (60 day rule applies to all parties to case where the United States is a party).

## STATEMENT OF THE ISSUES

There are two issues on this appeal:

**1.** Did the district court err when it held that, under California law, a "private individual under like circumstances" as the United States here, 28 U.S.C. § 2674, would only be liable to "specifically identifiable victims" despite the fact that the district court expressly held, at summary judgment, that a rational trier of fact could conclude that: (a) federal parole officers repeatedly breached mandatory duties to report drug-related parole violations to the U.S. Parole Commission of a violent rapist and kidnapper whose criminal tendencies were aggravated by drug use; and (b) federal parole officers' breaches of those duties proximately caused an 11-year-old girl, Appellant Jaycee Dugard, to be kidnapped, to be drugged and raped for years, to bear two children to her kidnapper, and to be held as a slave for 18 years?

**2.** Did the district court err when it held that Appellants could only rely on the Government's (many) violations of its mandatory duties occurring after June 1990 in order to prove proximate cause?

## STATEMENT OF THE CASE

## I.  BACKGROUND FACTS

### A.  The Federal Parole System Generally.

As this Court knows from its criminal docket, federal convicts are no longer subject to parole. Under the Sentencing Reform Act of 1984, parole was abolished in the federal system for all crimes committed after November 1, 1987. *Marsh v. Taylor*, 925 F.2d 1131, 1132 (9th Cir. 1991) *See also* Fulwood, Isaac, *History of the Federal Parole System* (2003) (http://www.justice.gov/uspc/history.pdf).

As part of the abolition of parole, the federal system became a *determinate* sentencing system governed largely by the federal Sentencing Guidelines. Federal convicts are usually required to serve their entire sentences in prison with limited and specifically defined credits available per year for good behavior. 18 U.S.C. § 3624(b); *Barber v. Thomas*, 432 U.S. 474, 476-79 (2010).

When Phillip Garrido was convicted of rape and kidnapping in 1977 (as discussed below), the federal system operated quite differently. It was an *indeterminate* sentencing system, of which parole was a key component. Under that system, "Congress defined the maximum, the judge imposed a sentence within the statutory range (which he usually

could replace with probation), and the Executive Branch's parole official eventually determined the actual duration of imprisonment [through its power to determine when a prisoner would be paroled]." *Mistretta v. United States*, 488 U.S. 361, 365 (1989).

### B. Phillip Garrido Is Sentenced to 50 Years in Prison Following A History of Drug Use Leading to Violent Sexual Assaults.

At around 7:30 p.m. on November 22, 1976, Phillip Garrido asked a young woman in South Lake Tahoe, California, if she could lend him a ride. She agreed. Garrido directed her to an empty lot where he grabbed her, forced her down, handcuffed her, and bound her with tape. (7ER 1493.) Garrido then proceeded to drive her car for an hour to a shed in Reno, Nevada. Upon arrival, Garrido removed his victim's bindings and explained there was no way out. (7ER 1494.)

Garrido proceeded to rape his victim for hours until 3 a.m. At that time, a policeman patrolling the area happened to observe a broken lock on the shed and knocked on the door. The woman called for help and Garrido was arrested. (7ER 1494.)

Garrido blamed the rape and kidnapping on his heavy drug use. (7ER 1495-96.) At the time of the rape, he had taken four hits of LSD.

8

(7ER 1588-89.) Garrido had been a heavy drug-user since 1970, habitually using LSD, cocaine, amphetamines, and barbiturates. Sometimes, he would take up to 10 hits of LSD at a time. He frequently used LSD on an almost daily basis. He often bought "large amounts" of cocaine and went on days-long cocaine binges without sleep. (7ER 1584-1588.)

Garrido explained that drugs aggravated his deviant sexual impulses, which included fantasies about bondage and pre-pubescent girls. (ER 1589-93.) For example, Garrido explained at trial that he would masturbate and expose himself "by the side of schools, grammar schools and high schools… while I was watching young females …[ages] seven to ten." (7ER 1592.)

Following a federal trial, Garrido was convicted of kidnapping and was sentenced to 50 years in prison in 1977. (8ER 1774). Garrido was also convicted of rape in Nevada state court, for which he received a sentence of five years to life. (8ER 1776.)

Garrido's 1977 convictions were not his first run-ins with the law. His prior criminal record reveals numerous incidents of heavy drug use causing him to engage in sexual violence against young women and

9

girls. In 1976, he was charged in California for rape and kidnapping of *another woman* in South Lake Tahoe in June of that year. (7ER 1479-80, 8ER 1778.) In 1972, Garrido was charged with rape and contributing to the overdose of a juvenile girl, after he picked up two girls and took them to a local motel where a 15-year-old girl overdosed on drugs. (7ER 1479, 8ER 1825.) In 1970 and 1972, Garrido was twice sentenced to probation for possession of large amounts of LSD and marijuana. (7ER 1496-1497.)

Garrido's drug use did not cease even when he was in prison. Garrido committed several "drug-related infractions" while serving his federal sentence. (8ER 1690.) Drug-related infractions include: testing positive for a drug while in prison; possessing a drug in prison; or refusing to provide a urine sample. (6ER 1029-1031.)

**C.    Garrido is Paroled After Serving Just Over Ten Years.**

After serving roughly ten years of his 50-year sentence, Garrido was paroled from federal prison on January 20, 1988. (8ER 1690.) He was released to Nevada prison. Eight months later, Nevada released him to supervision by federal parole officers.

10

As a federal parolee, Garrido was required to comply with the general "conditions of release." Among other things, these general conditions required Garrido: (1) not to violate any law; (2) not to drink alcohol in excess; and (3) not to use narcotics. (6ER 1241-45.)

The Parole Commission also imposed "special conditions" of parole on Garrido. (8ER 1690.) Unlike general conditions which apply to every parolee, special conditions are additional requirements imposed on a parolee, which are tailored to the particular parolee's activity or background. (4ER 0792-93, 5ER 0961.)

Garrido's special conditions included drug aftercare and mental health aftercare. (8ER 1690.) As part of his drug aftercare condition, Garrido was required to attend drug counseling and to submit to regular drug testing. (6ER 1245, 7ER 1394, 8ER 1690-91, 9ER 2059.) As part of the mental health aftercare condition, Garrido was required to attend mental health counseling. (8ER 1690-91.) Garrido was also restricted from travel to Lake Tahoe, where he kidnapped his 1976 rape victim (and where, in 1991, he kidnapped Jaycee). (9ER 2011.)

### D. Parole Officers Are Well Aware of Garrido's Drug Use Leading to Sexually Violent Propensities.

The U.S. Probation Office for the Northern District of California was responsible for supervising Garrido's parole. (8ER 1698.) (The terms "probation officers" and "parole officers" are used interchangeably in this brief and throughout the record.)

In preparing to assume supervision, parole officers reviewed Garrido's file and background, which is customary. (4ER 0750, 0776-79.) Information regarding Garrido's prior convictions and arrests were in Garrido's file. (9ER 2011.) Garrido was given an offense severity of category seven (on a 1-8 scale) based on convictions for kidnapping and rape. (5ER 1076, 8ER 1690.)

Garrido's supervision plan, completed on August 10, 1989 by parole officer Houston Antwine, noted: "there is always a third party risk in this case that is greatly increased with the use of drugs"; "the potential for causing great physical harm is present if [Garrido] becomes unstable as a result of drug use"; and "question of where rather than if [Garrido] will become unstable." (9ER 2059.) These remarks by Antwine are consistent with prior observations in supervision notes at the time of Garrido's parole in 1988 that Garrido was "considered to be

12

a time bomb" and "like a pot boiling with no outlet valve." (7ER 1397, 1400.)

In Garrido's supervision plan, Antwine lists "close surveillance of medication and drug use" as the officer objective. (9ER 2059.)

### E. Parole Officers Were Required to Report Drug Related Violations by Garrido But Failed to Do So.

When parolees violate either a "general" or "special" condition of parole, or engage in drug use, there are rules directing parole officers what to do. Among them is the Parole Commission Rules and Procedures Manual (the "Commission Rules"). The Commission Rules are just that: rules. They are not elective or discretionary, but contain mandatory "directives" to officers regarding how to handle violations. It is a parole officer's obligation to follow the Commission Rules. (6ER 1128, 4ER 0730, 770, 5ER 0845, 0953-55.)

Drug use is a "significant" violation of parole. (5ER 1046-47.) The Commission Rules provided that its "policy is one of 'zero tolerance' regarding illegal drug use … Probation officers *shall* advise each parolee that even the first such illegal use is subject to and will result in intervention/sanction. … Any instance of illegal drug use by any parolee *shall* be reported by the probation officer to the Commission."

13

(6ER 1249-40 [Rule 2.40-13(c)].) "Any instance" means what it says: officers must report *even one* instance of drug use to the Commission. (4ER 0768-69, 5ER 0967.) Officers have no discretion to ignore a positive drug test by a parolee. Every positive drug test is *required* to be reported to the Commission. (5ER 0979, 6ER 1119.) An admission of drug use is treated the same as a positive drug test, and must be reported. (5ER 1032, 6ER 1129.)

"Flushing" describes the practice of consuming large amounts of water in order to dilute a urine specimen and avoid detection of drugs. (5ER 0831, 6ER 1053.) The Parole Commission was concerned with instances of flushing by parolees because it indicated they were hiding drug use. (5ER 0831-34.) Officers accordingly reported episodes of flushing to the Commission. (6ER 1125.) The Northern District's Probation Office memorialized this practice of reporting flushing in a written policy, and *mandated* reporting of any "diluted or otherwise fraudulent samples." (8ER 1730-31.)

The Commission Rules require "immediate" reporting of various violations to the Commission. "Immediate" reporting was expected to be within days of discovery of the violation. (5ER 0899-900, 1004.) An

officer *must immediately* report any violations of *special conditions of parole* such as, in Garrido's case, positive drug tests and missed drug counseling. (6ER 1253-54 [(Rule 2.42-02(b)(9)], 5ER 0964-65.)

Monthly treatment reports for Garrido show that he tested positive for one or more drugs (generally methamphetamine) on at least the following occasions prior to Jaycee's kidnapping:  September 22, 1989; September 25, 1989; October 2, 1989; October 9, 1989; October 13, 1989; November 9, 1989; November 17, 1989 and August 6, 1990. (7ER 1384, 1396, 1408-10, 1425.)

Garrido also admitted to drug use. In October 1989, Garrido admitted to using speed for about 3-4 months, marijuana for the past 6 months, and the prescription drug Mellaril, for which he had no prescription. (8ER 1739.) In November 1989, Garrido again admitted using methamphetamine and marijuana. (7ER 1410.) In July 1989, Garrido admitted using Mellaril. (7ER 1396.)

In addition to the positive tests and admissions, reports show Garrido had "low specific gravity" urine specimens (i.e., flushing) on the following occasions:  August 21, 1989; September 5, 1989; January 19, 1990; February 26, 1990; July 5, 1990; July 20, 1990; July 26, 1990;

15

August 16, 1990; August 20, 1990; September 6, 1990; September 10, 1990; September 20, 1990 and October 4, 1990. (7ER 1392-94, 1407, 1414, 1424-27.) On October 5, 1989, Garrido admitted to his parole officer that he had been "flushing."  (7ER 1391.)

Despite parole officers' mandatory obligations to (1) report a parolee's drug use under the zero tolerance policy (including flushing) and (2) "immediately report" a parolee's violation of the drug aftercare special condition of parole, the Parole Commission was *never* made aware of any of Garrido's positive drug tests, or Garrido's admissions of drug use, at any time. (5ER 1036-41, 1051-57.)

Treatment reports also reflect that Garrido failed several times to appear for drug testing, and did not show up for over 30 counseling appointments during the period 1989-91. (7ER 1408-1427.) The Parole Commission, however, was never advised at any time prior to Jaycee's kidnapping of any of Garrido's failures to show for drug testing and failures to show for counseling. (7ER 1039-41, 1051-52.) [3]

---

[3] Parole officers also failed to submit annual written reports to the Commission on several occasions as required (which should have alerted the Commission to Garrido's serial drug use). (4ER 0802-03, 5ER 1001-02, 8ER 1725.) Officers also failed to submit monthly reports on several occasions, as required. (5ER 0995, 0998.)

16

Attached as Addendum 1 to this brief is a table showing all of Garrido's almost 70 *documented* violations of drug-related conditions of parole, which should have been reported to the Parole Commission as required by parole officers' mandatory duties. [4]

### F. While on Parole, Garrido Kidnaps Jaycee.

In June 1991, after using drugs for years while on parole without consequences, an emboldened Garrido traveled over one-hundred miles from his home in Antioch, California, to South Lake Tahoe (the scene of his prior kidnappings). There, he kidnapped an 11-year-old Jaycee as she was on her way to school. With his wife Nancy, he used a stun gun to render her helpless and lifted her body into the back of his car. Then, as if to mock the worthless supervision by his parole officers, Garrido said, "I can't believe I got away with it." (5ER 0919-21.)

When Garrido arrived with Jaycee at his house, he took her into the bathroom, made her remove her school clothes, and forced her to touch him. (5ER 0923-24.) Things only got worse from that point.

---

[4] This table was in the record below. (4ER 0660-61.) We simply reformatted it so the citations are to the Excerpts of Record, rather than to exhibits on summary judgment.

Garrido took Jaycee into his backyard, where he handcuffed her and locked her up in a shed. (5ER 0925-26.)

Held locked up and chained in that backyard *for years*, Jaycee was repeatedly raped by Garrido, forced to dress up in costumes for Garrido's pleasure, and given speed and other drugs in an effort to have her keep up with his limitless sexual compulsions. (5ER 0935-36, 0944-45.) Garrido would sometimes rape Jaycee while watching videos he had taken of other children playing at local playgrounds. (10ER 2485.) She was kept chained up without food for long periods of time. (5ER 0943.) Jaycee was also a victim of Garrido's psychological torture and crazy rantings, which not only frightened her but made her question her own sanity. (5ER 0937-40, 1025.)

As if all this were not enough for any one person to bear, Jaycee gave birth during her time in captivity to two daughters by Garrido, Appellant A. Dugard (born in 1994) and former Plaintiff G. Dugard (born in 1997). (5ER 0932, 1008.)

The three of them lived in tents in a hidden portion of Garrido's backyard until they were rescued in 2009, 18 years after Garrido took Jaycee. They lived without heat; used a "port-a-potty-type thing" as a

18

bathroom; and were permitted to shower once-a-week with water from a garden hose. (5ER 0928-29, 1013-16.)

Jaycee and her two daughters were rescued on August 26, 2009, through a fortuitous series of events summarized in a report from the Inspector General for the State of California. (8ER 1798-1800.) [5]

## II.  PROCEDURAL HISTORY OF THE CASE

### A.  Jaycee Files a Complaint in Federal Court.

On November 10, 2010, just over a year after their rescue, Jaycee and her daughters filed administrative claims under the FTCA. The claims sought recovery of damages resulting from the Government's negligent supervision of Garrido. (9ER 2191.) The Government denied the claims on May 6, 2011. (2ER 0530.) On September 22, 2011, Jaycee filed a civil action against the United States under the FTCA, on her own behalf and as guardian *ad litem* for her children. (2ER 0525.)

As relevant here, the complaint alleged that the Government negligently performed numerous, mandatory duties when supervising

---

[5] The Federal Government also authored a report about the many failures by federal parole officers regarding Garrido, but initially kept it confidential. It was released by Chief Judge Ware of the Northern District of California, and can be found on the website of the Northern District at goo.gl/B2doKG (July 7, 2011 memorandum and December 2010 report) and goo.gl/zLHPSD (July 20, 2011 memorandum).

the parole of her kidnapper, Phillip Garrido, including duties to report roughly 70 drug-related violations by Garrido in the two-and-a-half years prior to Jaycee's kidnapping. The complaint alleged that, but for the Government's negligent performance of those duties, Jaycee would not have been kidnapped by Garrido on June 10, 1991. (2ER 0544.)

On October 14, 2011, Chief Judge Kozinski issued an order designating Circuit Judge Carlos T. Bea to act as district judge for this case pursuant to 28 U.S.C. § 291(b). (3ER 0524.)

## B. The District Court Denies the Government's Motion to Dismiss and Rejects the Argument that a Private Person Would Not Be Liable In Like Circumstances.

On November 18, 2011, the United States appeared in the action and moved to dismiss for lack of jurisdiction. The motion advanced two arguments: (1) the United States was entitled to sovereign immunity on account of the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a); and (2) the United States was entitled to sovereign immunity because a "private individual" would not be liable "under like circumstances" under California law, 28 U.S.C. § 1346(b)(1), § 2674. (3ER 0472, 0494.) On April 5, 2012, the district court denied the motion

to dismiss as to all claims but two (where it granted leave to amend).
(1ER 0079.)

Because the discretionary function exception is jurisdictional, a
brief discussion of the district court's ruling is necessary. In the district
court's view, the interesting issue raised the discretionary function
exception was not so much whether Jaycee had alleged a breach of non-
discretionary duties (she clearly had, 1ER 0069-0073), but the fact that
Jaycee's damages claims rested, *in part*, on a causation theory
"involv[ing] an intervening discretionary act." (1ER 0063.) Stated
differently, Jaycee asserted (among other things) that if the
Government had not negligently performed its non-discretionary duties
when supervising Garrido, Garrido's parole would have been revoked
prior to Jaycee's kidnapping (parole revocation is a discretionary
decision) and harms to Jaycee and her children would have been
avoided.

The district court framed the issue as follows: "How can the
defendant's breach of duty be proven to be the cause of plaintiff's injury,
if the injury indisputably could not have been brought about without an
additional discretionary act or omission of the defendant, for which the

defendant is immune from liability?" (1ER 0064.) Having framed the question, the district court then answered it: "the trier of fact may find that had the defendant not breached his [mandatory] duty, the defendant would, more likely than not, have exercised his discretion in a manner that would have prevented injury to the plaintiff[s]."

(1ER 0065-66.)

> The district court further illustrated the issue by analogy:
>
> Consider a personal injury case, lost by the plaintiff because his attorney failed to call an expert witness to testify to the excessive speed of the defendant's vehicle prior to impact, based on the length and pattern of the skid marks leading to the point of impact with plaintiff's vehicle, and the damage caused to both vehicles by the impact. The jury in the malpractice case is asked to determine whether had such evidence been presented to the prior jury, the verdict would have been for plaintiff. Certainly, that first jury could still have used its discretion to find for the defendant, based on its common sense and its evaluation of the methods used by such an expert witness. So, here. Plaintiff submits the jury in this case should be allowed to find that had the defendant not breached the duties she alleges were mandatory, the [U.S. Parole Commission ("USPC")] would, more likely than not, have exercised its discretion to revoke Garrido's parole at a time before Garrido kidnapped her. The jury could so find; the jury could certainly also find that even had the USPC had all the subject evidence before it, the USPC might still have decided, based on its common sense and its consideration of the complex goals of the parole laws, to let Garrido remain at liberty. This is precisely the task of the jury.

(1ER 0065-66.) *See also* 1ER 0063-68, relying on *In re Glacier Bay*, 71 F.3d 1447, 1450 (9th Cir. 1995); *Vickers v. United States*, 228 F.3d 944, 951-53 (9th Cir. 2000); *Payton v. United States*, 679 F.2d 475, 482-83 (5th Cir. 1982) (en banc).

The district court then turned to the Government's contention that a "private individual" would not be liable "under like circumstances" as the United States. 28 U.S.C. § 1346(b), § 2674. The court rejected the argument. The court noted that "liability for negligent conduct may be imposed where there is a *duty of care owed by the defendant* to the plaintiff *or to a class of which the plaintiff is a member*." (1ER 0078 (emphasis added).) "Persons have a duty to control the conduct of another where those persons stand in some special relationship to the person whose conduct needs to be controlled." (1ER 0078 (citing Restatement (Second) of Torts §§ 315-20).) In particular, the district court cited § 319 of the Restatement: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from

doing such harm." (1ER 0078, citing *People v. Heitzman*, 9 Cal. 4th 189, 212 (1994).)

The question then was whether Garrido was within the "control" of the Government. "Under California law, 'the ability to control the third party' is essential to a special relationship." (1ER 0079, quoting *Wise v. Superior Court*, 222 Cal. App. 3d 1008, 1013 (1990).) "Under this test, a parole officer has a special relationship to a parolee for the purposes of tort liability under § 319." (1ER 0079.)

Two amended complaints were later filed, which were directed to a collateral dispute not relevant here. (2ER 0272, 0249.)

## C. Discovery Proceeds and G. Dugard, One of Jaycee's Daughters, Is Dismissed From the Case.

Following the denial of the motion to dismiss, the parties proceeded to take discovery. In the middle of discovery, Plaintiff G. Dugard voluntarily dismissed her claims with prejudice. The dismissal of G. Dugard followed Jaycee's deposition. Jaycee's deposition was remarkable in many respects but, as relevant here, the deposition set the stage for G. Dugard's request to be dismissed.

At Jaycee's deposition, the Government spent much of its time asking her a series of bizarre and confrontational questions, which were

24

apparently directed to trying to prove that Jaycee's damages were somehow exaggerated. For example, the Government's areas of inquiry included: asking Jaycee why she "chose to stay" with the Garridos and had not simply "ask[ed] Mr. Garrido to let [her] go home" (11ER 2733, 2737); inquiring whether Jaycee had been a voluntary participant in her own druggings by Garrido (11ER 2738); repeatedly prodding Jaycee to somehow admit that she had, in truth, "loved" the Garridos, was "attached" to them, and actually "enjoyed" much of her time with them (11ER 2728-30, 2736, 2739, 2741-42); and implying that Jaycee should at least partially appreciate that she was kidnapped and raped repeatedly starting at age 11 because, after all, she had two daughters (whom she loves) as a direct result of that conduct (11ER 2740, 10ER 2215-16).

Given these lines of inquiry, and especially the confrontational manner in which they were pursued, there were serious concerns about whether Jaycee's youngest daughter, G. Dugard, should be subjected to a deposition by the Government's counsel. Predictably enough, just a few days after Jaycee's deposition, the Government asked for dates to depose Jaycee's daughters. (11ER 2745.)

G. Dugard is Jaycee's younger daughter. When the Government sought to take her deposition, she was 15 and had lived almost her entire life in a tent in a hidden portion of the backyard of a psychopath. (11ER 2757 (¶¶ 5-7).)

Given these circumstances, counsel for the Dugards requested that the Government forego taking G. Dugard's oral deposition. The Government refused and, instead, noticed the deposition on two weeks' notice. (11ER 2747.) Appellants moved for a protective order prohibiting the oral deposition of G. Dugard, and her therapist explained in detail why a deposition would pose a danger to her health. (11ER 2757-60 (¶¶ 8-17).) The district court denied the motion. (11ER 0210.)

Although we would have preferred that the district court had exercised its discretion differently, we understand the decision and do not take issue with it here. Following the district court's denial of the motion for a protective order, G. Dugard dismissed all her claims with prejudice on April 8, 2013. (2ER 0202.)

### D. The Court Largely Denies the Government's Motion for Summary Judgment But Dismisses for Lack of Jurisdiction Because It Now Finds that a Private Individual Would Not Be Liable Here.

On August 2, 2013, at the close of discovery, the Government filed a dispositive motion styled as the "United States' Motion to Dismiss, for Judgment on the Pleadings, or for Summary Judgment." (9ER 1919.) The motion advanced eight different grounds for judgment in favor of the Government. Two grounds were mooted when certain claims were withdrawn by Appellants. The remaining six grounds are as follows:

1. The discretionary function exception applied for essentially the same reasons advanced in the motion to dismiss. (9ER 1928.)

2. A "private individual" would not be liable "under like circumstances" for similar reasons advanced on the motion to dismiss. (9ER 1954.)

3. The Government is entitled to judicial immunity for actions of its parole officers. (9ER 1944.)

4. Jaycee and A. Dugard could not raise triable issues of fact that the Government's breaches of duty were the proximate cause of their injuries. (9ER 1970.)

27

5. A. Dugard had no viable claim because, in the Government's view, she was actually making a claim for "wrongful life" not recognized by California law. (9ER 1992.)

6. The claims were barred by the statute of limitations as, among other things, the claims accrued in 1991 because "Jaycee was aware that she had been kidnapped and locked up in a shed in June 1991." (9ER 1987.) Equitable tolling did not apply, according to the Government, because "[t]here is no evidence suggesting that Jaycee exercised due diligence in pursuing her claims" while in captivity. (9ER 1991.)

Jaycee and A. Dugard opposed the motion. The district court rejected the Government's renewed argument that the discretionary function applied to bar the action (1ER 0027-35); rejected the argument that federal parole officers were entitled to judicial immunity under the circumstances here (1ER 0036-38); rejected the argument that A. Dugard's claim was one for "wrongful life" (1ER 0051-53); and rejected the argument that the claims were barred by the FTCA's statute of limitations (1ER 0048-50).

On proximate cause, the district court held that Jaycee and A. Dugard had raised triable issues of fact that the Government's repeated breaches of duties proximately caused their damages. (1ER 0043-48.) However, the court held that Jaycee and A. Dugard could not prove that the United States' breaches of duties *prior to* July 1990 were the proximate cause of those damages. (1ER 0041-43.) This ruling imposing a time limitation on proof of proximate cause, and its basis, is discussed further below in Section II of the Argument section. We respectfully submit that this ruling was error.

Finally, the district court again considered the issue of whether the United States was entitled to sovereign immunity because a "private individual" would not be liable in "like circumstances." Recognizing, as it did on the motion to dismiss, that California follows Restatement (Second) of Torts § 319, the district court held that California cases have nevertheless "consistently narrowed the scope of duty" in such cases so that a defendant with "control" over a third party only owes a duty to "a very small group of *specifically identifiable and foreseeable victims*." (1ER 0009 (emphasis added).) Because Jaycee and A. Dugard were not "specifically identifiable or foreseeable to the parole

officers as potential victims of Garrido," the district court held that a "private individual" would not be liable "under like circumstances," 28 U.S.C. § 2674, and dismissed the action.

The district court misread California law. This is the primary issue on appeal.

## SUMMARY OF ARGUMENT

In the context of "private individuals," 28 U.S.C. § 2674, California cases have consistently rejected the argument that when a dangerous third party is in a special relationship with a defendant, the defendant only has a duty to "specifically identifiable" victims of the third party. *Bragg v. Valdez*, 111 Cal. App. 4th 421, 425, 432 (2003); *Reisner v. Regents of the Univ. of California*, 31 Cal. App. 4th 1195, 1198-99 (1995); *Myers v. Quesenberry*, 144 Cal. App. 3d 888, 892-93 (1983).

For example, in *Bragg*, doctors released a mental patient who they knew was dangerous to himself and others. *Bragg*, 111 Cal. App. 4th at 427. The patient then murdered a woman. When the woman's children sued the doctors, the trial court dismissed because the woman was not "readily identifiable" to the doctors. The Court of Appeal reversed, holding that the doctors "owed a duty to anyone assaulted or injured" by the patient as a proximate cause of the doctors' actions. *Id.* at 432. Among other things, plaintiffs alleged that the doctors had a duty to tell the patients' family "of the grave consequences that could occur if [patient] were to discontinue his medications." *Id.* at 429. *See also Reisner*, 31 Cal. App. 4th at 1198-99 (HIV-infected boyfriend of minor

31

girl could sue doctors for failing to advise girl's parents of her HIV-infection three years before relationship began, because parents could have taken steps to protect boyfriend; "immaterial" that boyfriend was "unidentifiable third party" to doctors).

Here, Jaycee alleges that parole officers breached their mandatory duties to advise the Parole Commission of Garrido's numerous drug-related parole violations. Given Garrido's history, parole officers knew of "the grave consequences that could occur if [Garrido] were to [ ]continue" to use drugs. *Bragg*, 111 Cal. App. 4th at 427. As Garrido's parole officer acknowledged at the time of his parole, "there is always a third party risk in this case that is greatly increased with the use of drugs"; and "the potential for causing great physical harm is present if [Garrido] becomes unstable as a result of drug use." (9ER 2059.) Yet despite knowing this, and despite being under duties to immediately report drug use by Garrido, parole officers never reported his various drug violations to the Parole Commission. As the district court found, a rational trier of fact could find that the failure to report drug use to the Parole Commission was the proximate cause of Appellants' injuries. Like *Bragg*, it is of no moment that Jaycee was not a "specifically

32

identifiable" victim. *Id.* at 432. The Government's parole officers had a duty to report the drug use to a specifically identifiable person, the U.S. Parole Commission (just as doctors in *Bragg* had a duty to warn the patient's family about the patient's need for medication).

The cases the district court relied upon were inapposite for various reasons. First, many of the cases related to the duties of *state officers*, not "private individuals." As the Supreme Court has repeatedly held, it is error under the FTCA to determine potential liability by looking to the duties of state officers under state law. *United States v. Olson*, 546 U.S. 43, 46-47 (2005).

Second, the district court relied on cases involving "private" halfway houses under contract with the State. Those cases, however, expressly rely on *state governmental immunities* to find no duty. Thus, they are not appropriate private person analogues, as they "backdoor" inapplicable state government immunities into the FTCA analysis. Just as importantly, the specific duties alleged in those cases—an alleged duty to prevent the escape of dangerous probationers or to refuse dangerous probationers from living in halfway houses—are not at issue here. Jaycee does not allege that the Government should not have

allowed Garrido into the federal parole program or that he should not have "escaped" from parole. Rather, like *Bragg* and *Reisner*, she alleges that parole officers had a duty to report drug use to the Parole Commission, which in turn would have taken steps to protect victims of Garrido (by revoking parole or otherwise controlling his drug use).

Finally, the court's reliance on *Vu v. Singer Co.*, 706 F.2d 1027 (9th Cir. 1983), was erroneous. Contrary to the district court's holding, that case is not binding authority: it was *not even interpreting California law de novo*. When *Vu* was decided, the Ninth Circuit "applied a deferential standard of review to a district judge's construction of the law of the state in which he or she sits, accepting that construction unless it is 'clearly wrong.'" *Matter of McLinn*, 739 F.2d 1395, 1397 (9th Cir. 1984) (en banc) (overruling that standard of review). Thus, *Vu* stands *solely* for the proposition that the district court's underlying holding in that particular case was not "clearly wrong." *Id.* In any event, the duties alleged in *Vu* are not analogous to those here, and *Vu* is contrary to later California cases discussed above.

As to causation, while the district court correctly held that Jaycee could prove proximate cause for the Government's failure to report

34

violations after June 1990, it erred by holding that she could not rely on violations prior to that time. The principal error the court made was in concluding that Jaycee could *only* establish causation if she could prove that Garrido would have been *in prison* on June 10, 1991. (1ER 0041-42.) As explained below, however, there are several reasons to believe that if Garrido had gone back to prison and been reparoled prior to June 10, 1991, he still would not have kidnapped Jaycee. Indeed, it is hard to believe that if Garrido had gone back to prison for a year in, say, November 1989 and gotten out in November 1990, his life would have unfolded *exactly the same* as if he had not gone to prison at all, such that he still would have driven 100 miles to South Lake Tahoe on June 10, 1991, at the exact same time, encountered Jaycee at the exact same time, and abducted her.

## STANDARDS OF REVIEW

Under the FTCA, whether a "private individual under like circumstances" as the United States could be held liable under state law is reviewed de novo. *Will v. United States*, 60 F.3d 656, 659 (9th Cir. 1995). Whether partial summary judgment was properly granted on causation is also reviewed de novo. *White v. Roper*, 901 F.2d 1501, 1503 and 1506 (9th Cir. 1990).

## ARGUMENT

### I. Under California Law, "A Private Individual Under Like Circumstances" Could be Liable For the Conduct Here.

#### A. The "Private Person Analogue" Under the FTCA.

The FTCA provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a *private individual* under *like circumstances*." 28 U.S.C. § 2674 (emphasis added).

By using the phrase "private individual," Congress intended to preclude basing the Federal Government's tort liability on special liability doctrines created by state courts and legislatures for state and local governments. "The Federal Tort Claims Act … is not self-defeating by covertly embedding the casuistries of municipal liability for torts." *Indian Towing Co. v. United States*, 350 U.S. 61, 65 (1955). Despite the conceptual difficulties this standard may sometimes impose when dealing with uniquely governmental functions, the Supreme Court has time and again reaffirmed that courts are *not* to look to state tort liability doctrines applicable to state governments, but *only* to doctrines applicable to *private persons. See, e.g., United States v. Olson*, 546 U.S. 43, 46 (2005); *Rayonier Inc. v. United States*, 352 U.S. 315, 320 (1957).

37

For the same reasons, the Supreme Court has also repeatedly rejected attempts to import "restrictive state rules of immunity" into the FTCA. *United States v. Muniz*, 374 U.S. 150, 164 (1963); *Indian Towing*, 350 U.S. at 69.

By using the term "*like* circumstances," Congress did *not* intend to limit liability to what "would be imposed on a private individual 'under the *same* circumstances.'" *Id.* at 64 (emphasis added). Thus, in *Indian Towing*, the Supreme Court considered the liability of the United States for the negligent maintenance of a lighthouse which caused a tug boat to ground ashore and damage its cargo. *Id.* at 62. The Government argued, essentially, that there was no private person analogue in state law because private persons do not maintain lighthouses. *Id.* at 64-65. The Court rejected the contention, holding that the reference to "like circumstances" requires analogy at a much more general level. "[I]t is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." *Id.* at 65. Thus, while the Government "need not undertake the lighthouse service, … once it exercised its discretion to operate a light … it was obligated to use due care to make certain that

38

the light was kept in good working order … or give warning that it was not functioning." *Id.* at 69.

## B. Duty Under California Negligence Law Generally.

Under the FTCA, the governing tort law is "the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1), which all agree is California. Like most jurisdictions, to prove a negligence claim in California, a plaintiff must present evidence that the defendant owed her a duty, that the duty was breached, and that the breach was the proximate cause of plaintiff's injuries. *United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*, 1 Cal. 3d 586, 594 (1970). The only element at issue is the first, duty.

Under California Civil Code § 1714, "[t]he general rule in California is that '[e]veryone is responsible ... for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person.'" *Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 771 (2011) (ellipses in original) (quoting Cal. Civ. Code § 1714(a)). The California Supreme Court's seminal decision in *Rowland v. Christian*, 69 Cal. 2d 108 (1968), "identified several considerations that, when balanced together, may justify a departure from the

fundamental principle embodied in Civil Code section 1714: the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved." *Cabral*, 51 Cal. 4th at 771 (quoting *Rowland*, 59 Cal. 2d at 113). Cases from the state and federal courts generally refer to these as "the *Rowland* factors." *See, e.g, Henderson v. United States*, 846 F.2d 1233, 1236 (*9th Cir. 1988); *Cabral*, 51 Cal. 4th at 772.

When looking at these factors, it must not be forgotten that "[l]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done." *Tarasoff v. Regents of Univ. of California*, 17 Cal. 3d 425, 434 (1976).

### C.  California Does Not Limit Duty to "Specifically Identifiable Victims" in the "Private Person" Context.

The district court held that the Government owed no duty to Jaycee because she was not "*specifically identified* to [the Government] as a foreseeable victim of Garrido before her kidnapping." (1ER 0027 (emphasis added).) The district court's holding was based on analogy to inapt cases (mainly involving liability of *state and local governments* or their contractors). We discuss the cases below.

As the district court recognized, the analysis begins with a general proposition of law, embodied in both Restatement (Second) of Torts § 315 and the California cases:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> > (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> >
> > (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) § 315 (1965). *See also Tarasoff*, 17 Cal. 3d at 436.

As the district court found, there was a special relationship between the Government and Garrido pursuant to § 319 of the Restatement. "One who takes charge of a third person whom he knows

41

or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." Restatement (Second) § 319 (1965).

As the court held on the motion to dismiss, "a parole officer has a special relationship to a parolee for the purposes of tort liability under § 319." (1ER 0041.) At summary judgment, the district court did *not* change its decision in this regard. Rather, the court held that California decisions have "modifi[ed]" the scope of this duty such that it is only owed to "a very small group of specifically identifiable and foreseeable victims." (1ER 0008-09.) As we explain below, this was error.

### 1. In California, Private Persons in a Special Relationship to a Third Party Have a Duty to Those Foreseeably Harmed by the Third Party.

#### (a) The Analogous California Cases.

The earliest relevant California case is the Court of Appeal's decision in *Poncher v. Brackett*, 246 Cal. App. 2d 769 (1966). There, plaintiff alleged that she was assaulted by defendants' minor grandson. *Id.* at 770. Defendants allegedly "knew of similar acts which had been committed by the minor, knew that he was 'emotionally and psychiatrically disturbed,' and had been warned by public officials and

others that he was potentially dangerous to the general public." *Id.* at 771 n.1. Relying on § 319 of the Restatement, the court held that allegations that "defendant grandparents had custody and control of minor grandson, that they knew that he was likely to cause bodily harm to others if he was not controlled" stated a claim against the grandparents. *Id.* at 773. The Court explained "[t]he ability to control the child, rather than the [parent or grandparent] relationship as such, is the basis for a finding of liability..." *Id.* at 772.

California courts have consistently reaffirmed these principals in the decades since *Poncher*, and have *expressly declined* to impose a requirement that the victim be "specifically identifiable." For example, in *Bragg v. Valdez*, 111 Cal. App. 4th 421 (2003), Joshua Lee was involuntarily admitted for a 72-hour psychiatric hold as a potential danger to himself and others, pursuant to Cal. Wel. & Inst. Code § 5150. *Id.* at 425. Lee was placed in restraints "for combative/assaultive behavior indicating a serious risk or potential to cause bodily harm to himself or others … and verbal threats of violence with a strong likelihood for carrying out severely aggressive or destructive behavior." *Id.* at 426.

43

After 72 hours, defendants determined that Lee was still a danger
to himself and others, and certified that he needed to be involuntarily
held for another 14 days. He was also prescribed various anti-psychotic
medications. *Id.* at 426-27. Because Lee had no insurance coverage,
however, defendants released him to the general public the next day
despite the finding that he needed to be held for 14 more days. *Id.* at
427. Defendants neglected to advise Lee's family "that failure to
continue taking the prescribed medications could and/or would have
grave consequences." *Id.* Seventeen days after his release, "Lee
attacked, kidnapped and stabbed plaintiffs' [mother], a 66-year-old
woman, with a knife, proximately causing her death." *Id.*

The victim's children sued the doctors. The trial court sustained a
demurrer. The Court of Appeal reversed and held that the trial court
erred when it held "that a physician's well-settled duty to exercise
reasonable care to control the behavior of a patient who may endanger
other persons is actionable only if that patient harms a readily
identifiable plaintiff." *Id.* at 425. Rather, the appellate court held that a
doctor who negligently releases a person, knowing he is "a danger to

himself and others, may be liable to the patient and *any person that patient injures*." *Id.* (emphasis added).

As to the scope of duty, the Court held that either of the following alleged duties could support liability: "(1) a failure to advise Lee and his family of the grave consequences that could occur if Lee were to discontinue his medications and (2) releasing Lee who was a danger to himself and others for a non-medical reason, lack of insurance, without taking steps to protect the public." *Id.* at 429. The Court *flatly rejected* the contention that the doctors' duty only ran to "readily identifiable" victims, and instead concluded that "based upon the factors set forth in *Rowland v. Christian*, [69 Cal. 2d at 113], defendants *owed a duty to anyone assaulted or injured by Lee*." *Id.* at 432 (emphasis added).

Another relevant authority is *Reisner v. Regents of the Univ. of California*, 31 Cal. App. 4th 1195 (1995). There, a doctor administered a blood transfusion to a 12-year-old girl named Jennifer. *Id.* at 1197-98. The next day, the doctor learned that the blood was contaminated with HIV. *Id.* at 1198. Inexplicably, the doctor and hospital never told Jenifer or her parents. *Id.* Three years after her blood transfusion, Jennifer started dating plaintiff Daniel and they became intimate.

45

"Obviously, since Jennifer did not know she had been exposed to AIDS, she could not warn Daniel about the risk he was taking." *Id.* Five years after the blood transfusion, Jennifer was diagnosed with AIDS. Jennifer and her parents told Daniel about her condition. Daniel tested HIV-positive shortly after Jennifer died. *Id.*

Daniel sued the doctor and hospital. The trial court sustained a demurrer, finding—precisely as the district court did here—that the doctor had no duty to Daniel since he was "an unidentifiable third party." *Id.* The Court of Appeal reversed. The Court held that "[w]hen the avoidance of foreseeable harm to a third person requires a defendant to control the conduct of a person with whom the defendant has a special relationship (such as physician and patient) or to warn the person of the risks involved in certain conduct, the defendant's duty extends to a third person with whom the defendant does not have a special relationship." *Id.* at 1198.

The defendants attempted to distinguish prior authority, such as *Tarasoff*, 17 Cal. 3d at 434-46, by noting that in *Tarasoff*, "the therapist knew the identity of his patient's intended victim whereas, in this case, defendants did not know Daniel or even that he existed." *Reisner*, 31

46

Cal. App. 4th at 1199. This was "immaterial" because "Daniel does not claim defendants had to warn *him*, only that they had to warn *Jennifer or her parents*, 'others [who were] likely to apprise [him] of the danger' (and, of course, did just that when they learned of it)." *Id.* (emphasis in original) (quoting *Tarasoff*, 17 Cal. 3d at 431). *See also Myers v. Quesenberry*, 144 Cal. App. 3d 888, 892-93 (1983) (doctors who allowed emotionally distraught woman to drive were liable to person struck by woman's car despite the fact that the person struck was "*not a readily identifiable victim*") (emphasis added).

Below, the district court relied on *Megeff v. Doland*, 123 Cal. App. 3d 251 (1981). In *Megeff*, a person who had been released from a mental hospital stabbed a man on the street without provocation and then stabbed the man and his wife in their apartment. *Id.* at 255. The victims sued the assailant's wife and adult daughter. Prior to applying the law to the facts, the Court in *Megeff* stated offhand that a third party in a special relationship "must have knowledge of a specific risk to an identifiable and foreseeable victim" to be held liable. *Id.* at 257 (citing *Tarasoff*, 123 Cal. App. 3d at 257).

47

The district court relied on that offhand statement as support for its interpretation of California law. (1ER 0008-09 n.5.) However, review of the opinion shows that this offhand statement was a paradigm example of non-binding dicta. In particular, the Court *did not rely at all* on that statement, but instead held that the defendant wife had no reason to foresee that her husband would stab a random victim. *Megeff,* 123 Cal. App. 3d at 259-60. As to the adult daughter, the Court held that she had no "control" over her father. *Id.* at 260-61. The district court's reliance on this unsupported dicta cannot be sustained in light of the fact that the *Megeff court itself did not rely on it*, and that the overwhelming weight of authority, discussed above, expressly rejects the proposition. [6]

Two final cases are worth mention: *Smith v. Freund*, 192 Cal. App. 4th 466, 469 (2011), and *Wise v. Superior Court*, 222 Cal. App. 3d

---

[6] We are aware that some Judges of this Court have not always agreed on what is and is not dicta. For example, see the debating opinions of then Judge Kozinski and Judge Tashima in *United States v. Johnson*, 256 F.3d 895, 914-916 (9th Cir. 2001) (opinion of Kozinski, J.), 919-921 (Tashima, J., concurring). The statement in *Megeff* would qualify as dicta under either view. The statement was not a reasoned statement considering the legal implications of the statement and alternatives to it (dicta for Chief Judge Kozinski), and it also was not necessary to the Court's decision (dicta for Judge Tashima).

1008, 1011 (1990). In both cases, the Court of Appeal addressed the potential liability to third party shooting victims of, respectively, the parents of the shooter and the wife of the shooter. The Court in *Wise* held that the wife had no duty because she did not have "control" over her husband. *Wise*, 222 Cal. App. 3d at 1013-14. The Court in *Smith* found no duty after reviewing the *Rowland* factors, because defendants "knew of no propensity or intention of [their son] to harm third parties (as opposed to himself or his parents)." *Smith*, 192 Cal. App. 4th at 474-75.

In both cases, the third party victims were *not* "clearly identifiable victims" (in *Wise*, the victims were passing motorists, and in *Smith*, the victims appear to have been random). Neither case, however, refers to any proposition of law that the victims must be "clearly identifiable." If California law were that a duty is only owed to "clearly identifiable victims," one would expect these cases to simply cite that fact, affirm the judgments in unpublished dispositions, and move on.

### (b)   Application of These Cases Here.

Applying the above authorities to the situation here makes clear that the Government's parole officers had a duty to Jaycee and A.

Dugard. First, like the victim in *Bragg*, it does not matter that Jaycee herself was not "readily identifiable." *Bragg*, 246 Cal. App. 2d at 425. Rather, because the Government knew that Garrido was "a danger to himself and others," it "may be liable to … *any person that [Garrido] injures*" (provided that Appellants prove proximate cause and, in the context of an FTCA case, breach of a non-discretionary duty). *Id. a*t 425 (emphasis added).

The doctors in *Bragg* had reason to know that releasing the patient would pose a danger to others. *Id.* at 426. Likewise, the Government here had (extremely specific) reasons to know that ignoring over *thirty different drug violations* by Garrido, and failing to report them to the Parole Commission (as required) would pose a danger to others. Garrido was an admitted kidnapper and repeat rapist. As Garrido himself explained at his criminal trial in 1977, his drug use exacerbated his deviant sexual and criminal propensities (such as leading him to sit outside schools and masturbate to prepubescent girls). When preparing to supervise Garrido, the Government's parole officer specifically noted that "there is always a third party risk in this case that is greatly increased with the use of drugs"; and "the potential

for causing great physical harm is present if [Garrido] becomes unstable as a result of drug use." (9ER 2059.) Despite knowing this, and despite being under mandatory duties to immediately report drug use by Garrido to the Parole Commission, parole officers were asleep at the wheel and never reported the violations in the two-and-one-half years before Jaycee was kidnapped. The Government had every reason to know that failing to report drug use would lead to foreseeable harm to third parties. Thus, under *Bragg*, there is no question that the Government "*owed a duty to anyone assaulted or injured by*" Garrido as a proximate cause of the breach of the Government's duties. *Bragg*, 246 Cal. App. 2d at 432 (emphasis added).

Second, again looking to *Bragg*, the court held that the doctors had a duty to advise Lee's "family of the grave consequences that could occur if Lee were to discontinue his medications." *Id.* at 429. Here, the Government was well aware of the "grave consequences that could occur if [Garrido] were to" *continue* using drugs and, thus, imposed a duty to report drug use to the Parole Commission. As the district court found, a rational trier of fact could find that the failure to report drug use to the Parole Commission was the proximate cause of Appellants' injuries.

Again, just like *Bragg*, it is of no moment that Jaycee was not a "specifically identifiable" victim. *Id.* at 432. The Government's parole officers had a duty to report the drug use to a "specifically identifiable" person, the Parole Commission (just as the doctors in *Bragg* had a duty to warn the patient's family about the patient's need for medication). It was foreseeable that the failure to comply with this duty to the Parole Commission would result in harm to third parties, like Jaycee. Despite knowing this, parole officers did *nothing* to report Garrido's drug use, which increased the "third party risk" to Jaycee.

Third, like the plaintiff in *Reisner*, Jaycee and A. Dugard have *never* claimed that "defendants had to warn [*them*]" of Garrido. *Id.* at 1199. Rather, Jaycee claims that the parole officers had a duty to report Garrido's drug violations *to the Parole Commission* (a "specifically identifiable person"). That was a mandatory, non-discretionary duty; the failure to comply with it was the proximate cause of Jaycee's and A. Dugard's injuries (or, as the district court found, a rational trier of fact could at least find that). The failure to report Garrido's drug violations to the Parole Commission is analogous to the failure of the doctor in *Reisner* to report the positive HIV test to Jennifer's parents. Had the

52

doctor reported the positive test to Jennifer's parents, they could have then taken steps to protect plaintiff in *Reisner* (e.g., by making sure that Jennifer advised prospective partners of her status). Here, had the parole officers complied with their duties and reported positive drug tests to the Parole Commission, the Commission could have taken steps to protect Jaycee (by revoking Garrido's parole *or* even by making sure that Garrido did not engage in regular drug use, which the Government knew aggravated "third party risk").

That Jaycee and the plaintiff in *Reisner* were not "clearly identifiable" is irrelevant. What matters is that *the persons to warn were clearly identifiable* (the Parole Commission in this case, and Jennifer and her parents, respectively, in *Reisner*). It was foreseeable that the failure to warn these clearly identifiable persons would result in harm to third parties, even if those third parties themselves were not clearly identifiable. Under *Reisner*, this is all that is necessary to support a finding of duty to Appellants.

In short, the California cases do *not* require the victim of a third party's conduct be "readily" or "clearly identifiable." Rather, they require that there be a "special relationship" between the third party

and the defendant, and that the defendant have reason to know that the failure to exercise reasonable care may cause harm to a foreseeable class of third parties. The district court erred by holding otherwise.

### 2. The Cases the District Court Relied Upon Are Inapposite.

In addition to the dicta from *Megeff* discussed above, the district court relied on three sets of cases for its finding that duty is limited to "specifically identifiable victims."

First, the district court relied on a number of cases against *state governmental entities*. (1ER 0007, 0011-14, 0019, relying on *Davidson v. City of Westminster*, 32 Cal. 3d 197 (1982); *Thompson v. County of Alameda*, 27 Cal. 3d 741 (1980); *Brenneman v. State of California*, 208 Cal. App. 3d 812 (1989); *McDowell v. County of Alameda*, 88 Cal. App. 3d 321 (1979).) These cases dealt with the potential liability of: city and county law enforcement officers (*Davidson* and *Thomson*); state parole officers (*Brenneman*); and county hospital officials (*McDowell*).

Two of these cases (*Brenneman* and *McDowell*) rely heavily on state government immunities. Such immunities, of course, are irrelevant under the FTCA. *Muniz*, 374 U.S. at 164; *Indian Towing*, 350 U.S. at 69. Although the district court nevertheless relied on all four

cases solely for their discussion of "duty" (and not immunity), that was still error. The Supreme Court has *repeatedly* directed the federal courts *not* to look at duties of state and local government entities, regardless of how analogous they may be. Most recently, the Court addressed the issue in its unanimous opinion in *United States v. Olson*, 546 U.S. 43 (2005). There, two injured Arizona mine workers sued under the FTCA for negligence of federal mine inspectors. *Id.* at 45. The Ninth Circuit held that the Federal Government had potential liability because state and local government mine inspectors could be held liable under Arizona law. *Id.* The Supreme Court reversed, and held that the Ninth Circuit erred by looking to the liability of *local government* mine inspectors, and not "look[ing] further afield" to find a private person analogue such as "private persons who conduct safety inspections." *Olson*, 546 U.S. at 46-47.

Just as it was error for the Ninth Circuit to look to how Arizona courts adjudicated claims against state mine inspectors, it was error here for the district court here to look to how California courts adjudicate claims against state law enforcement officers. Indeed, the California Supreme Court cases the district court relied upon *expressly*

*recognize* that the analysis of "duty" under California negligence law is *materially different for public officials than it is for private persons*. In *Davidson*, for example, the court expressly stated that when considering whether a duty of care exists regarding a public entity, courts must consider additional factors along with the traditional *Rowland* factors applicable to private persons. "When public agencies are involved, additional elements include 'the extent of [the agency's] powers, the role imposed upon it by law and the limitations imposed upon it by budget.'" *Davidson*, 32 Cal. 3d at 203. Those considerations, however, are *irrelevant* under the FTCA. *See, e.g., Rayonier*, 352 U.S. at 319-20 (rejecting argument that "a heavy burden may be imposed on the public treasury" by finding liability under FTCA); *Xue Lu v. Powell*, 621 F.3d 944, 947 (9th Cir. 2010) (not relying on particular case in FTCA matter, "because liability in that case depended on 'the unique authority vested in police officers'").

Second, the district court relied on three cases involving halfway houses, which were technically "private," but which housed inmates or probationers pursuant to a contract with the State or court orders. (1ER 0009-10, 0015, relying on *Rice v. Ctr. Point, Inc.*, 154 Cal. App. 4th

949, 951 (2007) (housing inmates pursuant to contract with State);

*Cardenas v. Eggleston Youth Center*, 193 Cal. App. 3d 331, 333 (1987)

(housing probationer pursuant to court order); *Beauchene v. Synanon*

*Foundation, Inc.*, 88 Cal. App. 3d 342, 345 (1979) (housing probationer

pursuant to court order).)

In *Beauchene*, a probationer placed in a halfway house "escaped"

and went on a "crime spree." *Id.* at 346. In rejecting duty by the halfway

house to a victim of the crime spree, the *Beauchene* court *expressly*

*relied upon* statutory immunity afforded to public agencies in like

circumstances under Cal. Gov. Code § 845.8: "Respondent concededly is

not a 'public entity or public employee' within the meaning of section

845.8. But the same public policy that moved the Legislature to

immunize Public release and rehabilitation programs from liability to

encourage such innovations in the interests of criminal justice compels

the conclusion that respondent's Private release and rehabilitation

program owed no legal duty to this appellant." *Beauchene*, 88 Cal. App.

3d at 348.

The *Cardenas* case involved similar facts, and cited *Beauchene*'s

discussion of government immunity for its holding of no duty. *Cardenas*,

193 Cal. App. 3d at 333. The *Rice* court simply relied on "the holdings of *Beauchene* and *Cardenas* and the public policy articulated in those decisions" (with explicitly discussing government immunity). *Rice*, 154 Cal. App. 4th at 956.

Because these cases rely on government immunities for their finding of no duty, they are not appropriate private person analogues under the FTCA. Rather, relying on these cases simply "backdoors" state government immunities into the FTCA duty analysis. The better private person analogues are the cases discussed above involving *purely* private persons, who are not under contract with the State and are not performing State government functions.

Regardless, the alleged duties in *Beauchene*, *Cardenas*, and *Rice*, are not at all analogous to the specific, alleged duties of the parole officers here. In *Beauchene*, plaintiff alleged that the halfway house was under a duty not to admit the probationer to its program given his dangerousness, and not to allow the probationer to escape. *Beauchene*, 88 Cal. App. 3d at 346-47. In *Cardenas*, plaintiff alleged that defendant had a duty to protect others from violent probationers living in the halfway house. *Cardenas*, 193 Cal. App. 3d at 333. In *Rice*, plaintiff

58

alleged that defendant had a duty to take "reasonable security precautions" to make sure that inmates did not escape from its premises. *Rice*, 154 Cal. App. 3d at 952.

This is *not* what Jaycee alleges here: she does not allege that the Government had a duty to not accept Garrido in parole (that would be a discretionary function), and she does not allege that the Government should not have allowed Garrido to "escape" parole. Rather, she alleges that the Government had a duty to report Garrido's repeated drug violations to a clearly identifiable "person": the Parole Commission. She alleges that parole officers knew that failing to control Garrido's drug use by reporting it to the Commission (as they were *required* to do) could lead to injuries to others. She alleges that her and her daughter's injuries were proximately caused by the Government's failures to report drug violations (and the district court held there was sufficient evidence for trial on that issue, 1ER 0046). These are essentially the duties alleged in *Bragg*, 246 Cal. App. 2d at 432; *Reisner*, 31 Cal. App. 4th at 1199; and *Myers*, 144 Cal. App. 3d at 892-93.

Finally, the district court held that it had no choice but to rely on this Court's decision in *Vu v. Singer Co.*, 706 F.2d 1027 (9th Cir. 1983).

Of course, the district court was correct that the Ninth Circuit's interpretations of California law are generally binding on the district courts. (1ER 0019-20.) That premise, however, is inapplicable to *Vu* for a simple reason that the district court overlooked. The *Vu* court was *not interpreting California law de novo*. Rather, as was the standard of review at the time, the Ninth Circuit applied "deference" to a California district court's construction of California law. Thus, *Vu* merely held that a district court had engaged in a "reasonable construction of California law." *Vu*, 706 F.2d at 1030, n.2.

When *Vu* was decided, the Ninth Circuit, like most other Circuits, "applied a deferential standard of review to a district judge's construction of the law of the state in which he or she sits, accepting that construction unless it is 'clearly wrong.'" *Matter of McLinn*, 739 F.2d 1395, 1397 (9th Cir. 1984) (en banc). The Ninth Circuit abandoned that standard in its en banc decision in *McLinn* (after *Vu*) and "held that appellate review of conclusions of state law should be under the … de novo standard." *Id.* at 1403. The Supreme Court soon followed the Ninth Circuit's lead. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) (other Circuits must engage in de novo review of state law).

Accordingly, *Vu* stands solely for the proposition that the district court's underlying holding in that particular case was "reasonable" or not "clearly wrong." *McLinn*, 739 F.2d at 1397. That cannot possibly bind a subsequent court *reviewing California law de novo*. [7]

To the extent *Vu* was ever persuasive, it is no longer so given the subsequent California authority cited above, which *flatly reject* the proposition that only "specifically identifiable" victims may sue. *Bragg*, 246 Cal. App. 2d at 432; *Reisner*, 31 Cal. App. 4th at 1199. In any event, as with *Beauchenne* (relied upon by *Vu*), *Cardenas*, and *Rice*, the duty alleged in *Vu*—that defendant had a duty to stop criminals from such conduct, *Vu*, 706 F.2d at 1028—is not the duty alleged here.

---

[7] For example, in habeas cases, federal courts review state convictions under a similarly deferential standard which asks whether the state court's holding was an "unreasonable application" of federal law. 28 U.S.C. § 2254(d)(1). Of course, Ninth Circuit habeas cases do *not* bind subsequent panels of this Court (or the district courts) when they review an issue of federal law de novo (such as on direct review of a federal criminal conviction). *See United States v. Symington*, 195 F.3d 1080, 1086 n.3 (9th Cir. 1999) ("The difference in procedural posture between direct federal review and habeas-based review makes *Perez* [a habeas case dealing with same issue] inapposite to this case").

### 3. A Private Individual Would be Liable Under Like Circumstances.

As set out above, there is no requirement under California law that a private individual has a duty only to a "specifically identifiable victim" in these circumstances. The district court erred by holding otherwise. This matter should be remanded for trial in light of the court's holding that there are triable issues of fact on all other disputed elements on the first claim for relief for negligent supervision.

## II.  The District Court Erred by Only Partially Denying Summary Judgment on Proximate Causation.

Although the district court found triable issues of fact with respect to proximate cause, it held that Appellants could only rely on the Government's violations of mandatory duties occurring after June 1990 to prove proximate cause. This was error.

### A.  Jaycee Was Not Required to Show that Garrido Would Have Been In Jail on June 10, 1991.

Throughout this case, Jaycee asserted a simple theory of causation: had the Government's parole officers complied with their mandatory duties to report all instances of Garrido's drug use to the Parole Commission, Jaycee would not have been kidnapped.

In opposing summary judgment, Jaycee provided (among many other things) testimony from the former head of the Parole Commission, Dr. Carol Getty, that there was a "presumption of revocation" for drug offenses at the time, and that she herself "would have issued a warrant for Garrido's arrest and begun the revocation process at the first signs of a watered urine specimen, positive drug test, or evidence of self-medication." (5ER 0887-88.) The Government's expert, Stephen Husk, a former hearing examiner at the Parole Commission, agreed, testifying

63

that if he had been presented with Garrido's drug violations *he would have recommended revocation.* (5ER 1065-67.)

Jaycee suggested three possible points in time when Garrido's parole violations would have caused his parole to be revoked by the Commission based on "clusters" of drug violations by Garrido: (1) November 1989; (2) between July 1990 and October 4, 1990; and (3) January 1991. (ER 0095-97.)

The district court correctly denied summary judgment based on the latter two time periods, finding that a reasonable trier of fact could conclude that "Garrido would have been imprisoned on June 10, 1991 and Jaycee Dugard would not have been kidnapped in South Lake Tahoe that day." (1ER 0046.) The court, however, granted partial summary judgment with respect to the first time period, November 1989, reasoning that Jaycee could *only* establish causation if she could prove that Garrido would have been *in prison* on June 10, 1991. (1ER 0041-42.)

Stated otherwise, the district court held that if Garrido were sent back to prison for a year in November 1989, and was released in November 1990, the events of Garrido's life would have unfolded *exactly*

*as they did had he not gone back to prison for a year*. Garrido still would

have found himself on June 10, 1991, driving to South Lake Tahoe *at*

*the exact same time*; he still would have encountered Jaycee *at the exact*

*same time*; and he still would have abducted her *at the exact same time*.

This violates common sense. A major change in Garrido's life, such as a

return to imprisonment, would almost certainly have consequences on

his subsequent conduct after he was released from prison.  At the very

least, a rational trier of fact *could* certainly conclude that events in

Garrido's life would have *not* have proceeded *exactly the same*.

Jaycee is not required to negate every possibility that Garrido

would still kidnap her. Causation "is ultimately a matter of probability

and common sense: '[A plaintiff] is not required to eliminate entirely all

possibility that the defendant's conduct was not a cause." *Raven H. v.*

*Gamette*, 157 Cal. App. 4th 1017, 1029 (1989). "It is enough that

[plaintiff] introduces evidence from which reasonable [persons] may

conclude that it is more probable that the event was caused by the

defendant than that it was not." *Id*.

In *Vickers v. United States*, 228 F.3d 944 (9th Cir. 2000), for

example, plaintiff was shot by her ex-husband, an INS agent. She

argued that the Government negligently investigated a prior dispute

involving her ex-husband and his revolver. *Id.* at 949. Plaintiff alleged

that had the INS properly investigated the prior dispute, the INS would

not have reissued the revolver to the agent prior to the incident where

the agent shot plaintiff. *Id.* at 949-50. The district court granted

summary judgment on causation, finding that "[the INS'] negligent acts

and omissions did not, as a matter of law, cause Ms. Vickers' injuries

because, among other reasons, [ex-husband] could have shot Ms.

Vickers with another gun." *Id.* at 948 n.3 (noting existence of another

gun in ex-husband's possession).

The Ninth Circuit reversed the grant of summary judgment,

holding that:

> There are factual questions in dispute about the availability
> of other guns in the house, but the bottom line … is that the
> shooter used a gun which he arguably should not have had.
> The fact that [the ex-husband] had his own Service-issued
> weapon in his possession at the time of the domestic dispute
> arguably at least increased the likelihood that he would use
> a gun violently, and that increase in likelihood of harm is
> sufficient for tort liability.

*Id.* at 955-56.

Here, like plaintiff in *Vickers*, Jaycee advanced a viable theory of

causation holding that if the Government had performed its mandatory

duties, it is more likely than not that Jaycee would not have been kidnapped. Jaycee submitted evidence which would permit a rational trier of fact to conclude that Garrido would not have kidnapped Jaycee had his parole been revoked *at any time* prior to her kidnapping.

### 1. There is Sufficient Evidence that Garrido Could Have Received a Revocation Sentence in Excess of the Guidelines.

There is sufficient evidence in the record to permit a reasonable trier of fact to conclude that, had Garrido's parole been revoked in November 1989, he would have received a parole sentence in excess of the parole guidelines range of 12 months such that he would have still been in prison on the date Jaycee was kidnapped. [8]

Indeed, Parole statistics for the Western Region of the Parole Commission show that the guidelines were exceeded in 1989 and 1990 approximately 10 percent of the time. (8ER 1755.) Jaycee's expert testified that Garrido likely would have received more than the twelve month upper guideline. (8ER 1899.) The Government's *own expert*

---

[8] The Parole Commission applies decision guidelines to determine the period of revocation, however, the guidelines may be exceeded in the Commission's discretion. (8ER 1755, 1899.) Garrido's drug violations (combined with aggravating or mitigating factors) would have resulted in a guideline range of 8 to 12 months. (8ER 1899.)

testified that during his tenure as a parole hearing examiner the guidelines could be exceeded by as much as ten times. (5ER 1068.)

The Parole Commission considers a number of factors in determining whether to exceed the guidelines including: the number of parole violations at issue, the non-cooperativeness of the parolee, and the nature of the initial offense. (5ER 1072-74.) Here, these factors all militate towards exceeding the guideline range. By November 1989, Garrido had *ten positive drug tests or admitted drug uses*, he had 16 missed counseling appointments, and had provided *3 diluted urine samples*. (Addendum 1.) Moreover, the nature of the initial 1977 offense was, to say the least, depraved and violent.

In addition, the Government's expert testified that he participated in a case involving a convicted rapist who had been out on parole for three months and was accused of stealing a woman's cell phone during an altercation. On these facts, the Commission *departed above* the applicable guideline range of 12 to 16 to 120 months of imprisonment – *ten times the suggested range*. (5ER 1069-70, *McCallum v. Reilley,* 2007 WL 2455662, *1 (N.D. W.Va. 2007).) Given that Garrido was a convicted rapist who, in November 1989, had been on parole for only a few

months, a trier of fact could certainly conclude based on the similar facts in *McCallum* that the Commission was likely to revoke Garrido's parole and significantly exceed the 12-month guideline range.

For all these reasons, a rational trier of fact could conclude that Garrido would be among the worst 10 percent of parole violators and received a revocation sentence above the applicable guidelines.

### 2. There is Sufficient Evidence That Garrido Would Use Drugs While Serving A Revocation Sentence Or While on Reparole.

Even if Garrido received a 12 month sentence, a rational trier of fact could conclude, given Garrido's past behavior, that Garrido would have committed drug infractions while (1) in prison, resulting in an extended sentence, or (2) while out on reparole, resulting in revocation.

It is undisputed that a revocation term will be extended if the prisoner commits a drug-related infraction and that each drug-related infraction adds up to *eight months* to his term. (5ER 1075.) While serving his prior federal sentence, Garrido committed three drug-related infractions while in custody. (5ER 1030-31.) Given Garrido's history of using drugs while in prison, the court's apparent assumption that *no* rational trier of fact could conclude that Garrido would use

while being re-incarcerated cannot be supported. *Campbell v. General Motors Corp.*, 32 Cal. 3d 112, 121 (1982) ("It is not incumbent upon a plaintiff to show that an inference in his favor is the only one that may be reasonably drawn from the evidence.").

Just as a rational factfinder could find that Garrido would have committed a drug infraction while in prison, it is perhaps *more likely* that Garrido would have engaged in drug use after being released on reparole. The evidence establishes that Garrido had an insatiable appetite for drugs. Garrido also had ten positive drug tests/admissions of drug use during his first few months on parole (in addition to multiple episodes of "flushing"). (Addendum 1.) Clearly, drug-testing and even imprisonment, did not deter Garrido's drug use. Had Garrido used while on reparole, revocation would have been a "foregone conclusion" and Garrido could not have kidnapped Jaycee. (8ER 1901.)

### 3. There is Sufficient Evidence to Conclude that a "Clean" Garrido Would Not Have Kidnapped Jaycee.

The alternative to Garrido's return to drug use is that he remain sober. All of Garrido's criminal history is linked to drug use. (7ER 1496-98.) There is *no evidence* of Garrido committing crimes while sober.

There is nothing in the record suggesting that a sober Garrido would have driven to South Lake Tahoe and kidnapped Jaycee.

In addition, Jaycee submitted expert testimony that "once returned to the community, supervision of the parolee was, as a matter of general practice, decidedly more stringent. … The parolee was also allowed fewer (if any) excuses for non-compliance with the conditions of parole. Parolees reparoled to the community were, in short, kept on a 'short leash.'" (8ER 1900.)

The district court rejected this testimony by Jaycee's expert, explaining that "the court does not consider Mr. Storey capable of giving the speculative behavioral psychological opinion as to how Garrido would act." (1ER 0042.) Storey, however, was *not* predicting how Garrido would act; rather, he provided his expert opinion (based on his over 25-years' experience as a probation officer) as to the *efficacy* of the heightened supervisory methods used on reparolees.

## CONCLUSION

For the reasons stated, the district court's dismissal of this action for lack of subject matter jurisdiction should be reversed, and the matter should be remanded for a trial on the merits.

DATED: May 9, 2014  Respectfully Submitted:

       KINSELLA WEITZMAN ISER
       KUMP & ALDISERT LLP


       By: /s/Jonathan P. Steinsapir
         Jonathan P. Steinsapir
         Attorneys for Plaintiffs and Appellants
         Jaycee Dugard and A. Dugard

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate 32(a)(7)(B) in that it contains 13,850 words (using Microsoft Word's word count tool) in a proportionally spaced typeface (Century Schoolbook).

DATED: May 9, 2014          Respectfully Submitted:

KINSELLA WEITZMAN ISER
KUMP & ALDISERT LLP


By:  /s/Jonathan P. Steinsapir
     Jonathan P. Steinsapir
     Attorneys for Plaintiffs and Appellants
     Jaycee Dugard and A. Dugard

## STATEMENT OF RELATED CASES

We are not aware of any related cases.

Dated: May 9, 2014      Respectfully Submitted:

KINSELLA WEITZMAN ISER
KUMP & ALDISERT LLP


By:   /s/Jonathan P. Steinsapir
      Jonathan P. Steinsapir
      Attorneys for Plaintiffs and Appellants
      Jaycee Dugard and A. Dugard

74

# ADDENDUM 1
## PAROLE VIOLATIONS OF PHILLIP GARRIDO PRIOR TO THE KIDNAPPING OF JAYCEE DUGARD

| Date | Positive Test/ Admission | Diluted Urine Test ("Flushing") | Failure to Appear for Drug Test | Failure to Appear for Counseling |
|---|---|---|---|---|
| 4/10/89 | | | | 7ER 1403 |
| 4/24/89 | | | | 7ER 1403 |
| 5/22/89 | | | | 7ER 1404 |
| 6/1/89 | | | | 7ER 1405 |
| 6/23/89 | | | | 7ER 1405 |
| 7/6/89 | | | | 7ER 1406 |
| 7/10/89 | | | | 7ER 1406 |
| 7/18/89 | 7ER 1396 | | | |
| 7/27/89 | | | | 7ER 1406 |
| 8/7/89 | | | | 7ER 1407 |
| 8/14/89 | | | | 7ER 1407 |
| 8/21/89 | | 7ER 1407; 7ER 1394 | | 7ER 1407 |
| 9/5/89 | | 7ER 1392-93 | | |
| 9/22/89 | 7ER 1408; 7ER 1391 | | | |
| 9/25/89 | 7ER 1408 | | | |
| 9/25/89 | | | | 7ER 1408 |
| 10/2/89 | 7ER 1409 | | | |
| 10/2/89 | | | | 7ER 1409 |
| 10/9/89 | 7ER 1409 | | | |
| 10/12/89 | [8ER 1739; 7ER 1391] | 7ER 1391 | | |
| 10/13/89 | 7ER 1409 | | | |
| 10/19/89 | | | | 7ER 1409 |
| 10/20/89 | | | 7ER 1409 | |
| 11/2/89 | | | | 7ER 1410 |
| 11/9/89 | 7ER 1410 | | | |
| 11/14/89 | 7ER 1410 | | | |
| 11/14/89 | | | | 7ER 1410 |
| 11/17/89 | 7ER 1410 | | | |
| 1/2/90 | | | | 7ER 1412 |
| 1/5/90 | | | | 7ER 1412 |

75

| Date | Positive Test/ Admission | Diluted Urine Test ("Flushing") | Failure to Appear for Drug Test | Failure to Appear for Counseling |
|---|---|---|---|---|
| 1/18/90 | | | | 7ER 1412 |
| 1/19/90 | | 7ER 1414 | | |
| 2/22/90 | | | | 7ER 1414 |
| 2/26/90 | | 7ER 1414 | | |
| 3/7/90 | | | | 7ER 1416 |
| 6/1/90 | | | | 7ER 1422 |
| 6/18/90 | | | | 7ER 1422 |
| 6/22/90 | | | | 7ER 1422 |
| 7/5/90 | | 7ER 1424 | | |
| 7/9/90 (alcohol) | 7ER 1424; 7ER 1386 | | | |
| 7/17/90 | | | | 7ER 1424 |
| 7/20/90 | | 7ER 1424 | | |
| 7/26/90 | | 7ER 1424 | | |
| 8/6/90 | 7ER 1425; 7ER 1384 | | | |
| 8/7/90 | | | | 7ER 1425 |
| 8/16/90 | | 7ER 1425 | | |
| 8/20/90 | | 7ER 1425 | | |
| 9/6/90 | | 7ER 1426 | | |
| 9/10/90 | | 7ER 1426 | | |
| 9/20/90 | | 7ER 1426 | | |
| 9/26/90 | | | | 7ER 1426 |
| 9/28/90 | | | | 7ER 1426 |
| 10/4/90 | | 7ER 1427 | | |
| 10/26/90 | | | | 7ER 1427 |
| 11/14/90 | | | | 7ER 1429 |
| 11/30/90 | | | 7ER 1429 | 7ER 1429 |
| 1/2/91 | | | | 7ER 1433 |
| 2/28/91 | | | | 7ER 1434 |
| 4/3/91 | | | | 7ER 1436 |
| 5/8/91 | | | | 7ER 1437 |
| 5/14/91 | | | | 7ER 1437 |
| 5/19/91 | | | 7ER 1437 | |
| **Total** | **12** | **14** | **3** | **36** |

76

# ADDENDUM 2
## PERTINENT STATUTES

### 28 U.S.C. § 2674 - Liability of United States

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof.

With respect to any claim under this chapter, the United States shall be entitled to assert any defense based upon judicial or legislative immunity which otherwise would have been available to the employee of the United States whose act or omission gave rise to the claim, as well as any other defenses to which the United States is entitled.

With respect to any claim to which this section applies, the Tennessee Valley Authority shall be entitled to assert any defense which otherwise would have been available to the employee based upon judicial or legislative immunity, which otherwise would have been available to the employee of the Tennessee Valley Authority whose act or omission gave rise to the claim as well as any other defenses to which the Tennessee Valley Authority is entitled under this chapter.

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Appellee's counsel of record is a registered CM/ECF user and will be served by the appellate CM/ECF system.

Dated: May 9, 2014        Respectfully Submitted:

KINSELLA WEITZMAN ISER
KUMP & ALDISERT LLP


By:  /s/Jonathan P. Steinsapir
      Jonathan P. Steinsapir
      Attorneys for Plaintiffs and Appellants
      Jaycee Dugard and A. Dugard